IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez

Civil Action No. 24-cv-03484-RMR

MICHAEL CONWAY, in his official capacity as the Commissioner of Insurance of the State of Colorado

    Plaintiff,

v.

FRIDAY HEALTH PLANS OF COLORADO, Inc., a Colorado Health Maintenance Organization,

    Defendant.

---

## ORDER

---

This matter is before the Court on the Motion by the Colorado Commissioner of Insurance to Remand the Notice of Removal Filed by the United States ("Motion to Remand"), ECF No. 19, and the United States' Motion to Set Aside State Court Order Granting Petitioners' Motion to Disburse Class 1 Funds, ("Motion to Set Aside") ECF No. 30. Both motions are fully briefed. The Court heard oral argument on both motions on May 28, 2024. ECF No. 42. The Court submitted questions for the parties to address during the hearing. ECF No. 41.

This case is about what happens when an insolvent insurer can no longer pay its risk adjustment charges under the Patient Protection and Affordable Care Act ("ACA"). Colorado argues it should be able to prioritize distributing funds out of the insolvent insurer's estate to insurers at risk of impairment because of the insolvent insurer's failure

to pay its risk adjustment charges under the ACA's Risk Adjustment Program. The federal government argues that the ACA governs any such disbursement and that Colorado cannot unilaterally adjust the obligations set forth under the ACA. In other words, the federal government asserts Colorado's statute is preempted by federal law. This interplay between state and federal law, and whether a new provision in Colorado's law setting priorities for insurer liquidations is preempted by the ACA and the Federal Priority Statute, is an issue of first impression that this Court must now decide.

While Colorado's assertion that the state is in the best position to make the distributions in order to assist Colorado insurers to continue operating is laudable and sensible, it still must comport with the law. This Court must apply the law as it stands to the issues before it. Colorado argues this Court should remand the case back to the state court. However, whether there is federal preemption of Colorado's statute creating a new priority class, a first of its kind in the nation, is exactly the type of issue to be decided in federal court. For the following reasons, the Court DENIES the Motion to Remand and GRANTS the Motion to Set Aside.

## I.    BACKGROUND[1]

The ACA was designed to expand coverage in individual health insurance markets nationwide. *See* Pub. L. No. 111-148, 124 Stat. 119 (2010), *amended by* the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010). The ACA directed the United States Department of Health and Human Services ("HHS"),

---

[1] The Background is taken from the Notice of Removal, the parties' briefing, and associated Appendixes. ECF Nos. 1, 1-1 to 1-6, 19, 19-1, 30, 30-1, 34-36.

which administers the ACA, to issue regulations that establish standards and a federal methodology for a Risk Adjustment Program. In general, the ACA's Risk Adjustment Program is designed to foster a stable marketplace by charging insurers of individuals with below-average actuarial risk and paying insurers of those with above-average actuarial risk. 42 U.S.C. § 18063(a). It "is intended to provide increased payments to health insurance issuers that attract higher-risk populations, such as those with chronic conditions, and reduce the incentives for issuers to avoid higher-risk enrollees." 2014 Final Rule, 78 Fed. Reg. at 15,411. The Risk Adjustment Program operates on a state-by-state basis, and states are permitted to craft their own programs, provided the plans comply with federal standards. 42 U.S.C. § 18041(a)–(b). If states fail to act, however, HHS steps in and operates the program. In Colorado and New Mexico, HHS operates the program. ECF No. 30-1 at 8.

Under the ACA's Risk Adjustment Program, insurers are required to submit annual risk adjustment data for the applicable benefit year by April 30 of the following year. 45 C.F.R. § 153.730. HHS notifies the health insurers on June 30 how much they owe or will receive under the program for the preceding benefit year. 45 C.F.R. § 153.310(e). The problem becomes when an insurance carrier does not or cannot pay what it owes, *i.e.*, its risk adjustment charge. The ACA accounts for when HHS is unable to collect the full risk adjustment charges owed to it by adjusting the payments to the other insurers on a pro rata basis. ECF No. 30 at 8 (citing Centers for Medicare and Medicaid Services, *Risk Adjustment (RA) FAQ*, (May 22, 2020), https://www.hhs.gov/guidance/document/risk-adjustment-ra-faq-127). Thus, if for a given year and state market, HHS only collects 80

percent of the charges owed by insurers, insurers set to receive risk adjustment payments will only receive 80% of the payment they were expecting. One insurer's failure to pay its risk adjustment charge can result in another insurer's impairment.

Friday Health Plans of Colorado, Inc. ("Friday Health") and Denver Health Medical Plan, Inc. ("Denver Health") are healthcare insurers in the Colorado insurance market that participated in the Colorado Risk Adjustment Program operated by HHS for benefit years 2022 and 2023. Friday Health also offered health plans in New Mexico and other states. Friday Health operated under the same Tax Identification Number and Payee ID for the Risk Adjustment Programs for both Colorado and New Mexico. For the 2022 benefit year, Friday Health was assessed total risk adjustment charges across Colorado and New Mexico of $26,577,025.20. ECF No. 30-1 at 18. Denver Health was due to be paid $18,775,040.37 by HHS for the benefit year 2023. ECF No. 1-4 at 9. Friday Health became insolvent. On August 16, 2023, a Colorado state court entered an order to liquidate Friday Health. ECF No. 1-3. Because of the liquidation, Friday Health was unable to pay what it owed toward the risk adjustment program. HHS collected $7,043,943.70 from Friday Health before it entered liquidation. Friday Health still owes HHS $19,533,081.50 under the Risk Adjustment Program. On August 6, 2024, Denver Health was notified that it would only receive a partial payment of $12,051,653.61 from HHS. ECF No. 1-4 at 11. Denver Health's anticipated risk adjustment payment was

reduced by $6,723,386.76 because of Friday Health's inability to pay its risk adjustment charge.

When an insurer becomes insolvent, the state's Commissioner of Insurance will petition the state court to enter an order of liquidation. Liquidation is a bankruptcy-like proceeding during which a liquidator collects and distributes an insurer's assets. In Colorado, such proceedings are governed by the Insurers' Rehabilitation and Liquidation Act. Colo. Rev. Stat. §§ 10-3-501 to 10-3-559. Parties who believe they are owed money from an insolvent insurer must file a claim of liquidation. §§ 10-3-534(1), -533. Payments on claims are distributed by priority classes 1 through 8, as outlined in § 10-3-541 (hereinafter "Colorado's priority statute"). In this case, the state court appointed Michael Conway ("Commissioner" or "Conway"), the Commissioner of Insurance of the State of Colorado, to serve as Liquidator.

In May 2023, shortly before Friday Health was determined to be insolvent, Colorado amended its priority statute, authorizing the Liquidator to transfer payments owed by an insolvent insurer to HHS under the ACA's Risk Adjustment Program directly to another insurer as a class 1 claim "if the commissioner determines that the failure of the impaired or insolvent insurer to pay such risk adjustment program payments would result in the impairment or insolvency of claimant member insurer and that such impairment or insolvency would be avoided by payment of the claim." Colo. Rev. Stat. § 10-3-541; 42 U.S.C. § 18063.

On June 25, 2024, HHS filed a proof of claim, per § 10-3-534(1). ECF No. 19-1 at 7-89. Under Colorado's priority statute, the federal government is a class 3 claimant. § 10-

3-541(1)(c). Should HHS receive any payment on its claim, those funds will be applied to the Risk Adjustment Programs in Colorado and New Mexico because Friday Health operated under the same Taxpayer Identification Number and Payee ID for the federal Risk Adjustment Programs in Colorado and New Mexico. ECF No. 30 at 12. By creating a new subcategory of a class 1 claimant, the Colorado priority statute allows an insurer who would receive funds only if and when the class 3 claims were paid to HHS to receive funds as a class 1 claimant.

On November 14, 2024, Conway asked the Colorado state court to enter an order authorizing it to disburse $6,723,386.76 from Friday Health's estate to Denver Health as a class 1 claimant (the "Distribution Motion"). The amount to disburse is based on the amount Denver Health would have received through the HHS-operated Risk Adjustment Program for the 2023 program year had Friday Health paid into the program. On December 6, 2024, the Colorado state court entered the order (the "Implementation Order"). On December 16, 2024, the government removed the case to this Court, arguing that the Distribution Motion and Implementation Order are directed at HHS.

The Commissioner filed his Motion to Remand on January 15, 2025. ECF No. 19. The government filed a response to the Motion to Remand, ECF No. 31, and the Commissioner filed a reply, ECF No. 35. On February 20, 2025, the government filed its Motion to Set Aside, asking the Court, pursuant to the Supremacy Clause, to set aside the Implementation Order permitting Conway to disperse $6.7 million to Denver Health. ECF No. 30. As a matter of first impression, the government argues that Colorado's new law conflicts with the Federal Priority Statute, 31 U.S.C. § 3713, and the ACA because it

prioritizes a claim of a private Colorado insurer over the federal government and authorizes Conway to alter the payment method used by HHS. Conway filed a response to the Motion to Set Aside. ECF No. 34. The government filed a reply. ECF No. 36.

## II.    THE MOTION TO REMAND

### A.    Legal Standard for Remand

"A civil action . . . that is commenced in a State court and that is against" as relevant here, "[t]he United States or any agency thereof" "may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending." 28 U.S.C. § 1442(a)(1). The "basic purpose" of the "federal officer removal" statute "is to protect the Federal Government from [ ] interference with its operations. . . ." *Watson v. Philip Morris Co. Inc.*, 551 U.S. 142, 150 (2007) (internal quotations omitted). HHS, as the party asserting federal officer removal, bears the burden of establishing jurisdiction by a preponderance of the evidence. *Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013). This burden is met by "a substantial factual showing," *Wyoming v. Livingston*, 443 F.3d 1211, 1225 (10th Cir. 2006), that supports "'candid, specific and positive' allegations*." In re MTBE Prods. Liab. Litig.*, 488 F.3d 112, 130 (2d Cir. 2007) (citation omitted). But unlike some other removal statutes, § 1442 should "be liberally construed to give full effect to [its] purpose[ ]." *Colorado v. Symes*, 286 U.S. 510, 517 (1932).

Federal courts may remand improperly removed actions back to state court under 28 U.S.C. § 1447. The Tenth Circuit has recognized two grounds for remand under the statute: (1) a lack of subject-matter jurisdiction; and (2) a defect in the removal procedure.

*See Miller v. Lamberth*, 443 F.3d 757, 759 (10th Cir. 2006). "Nonjurisdictional defects must be raised within 30 days after the filing of the notice of removal or they are waived." *Sheldon v. Khanal*, 502 F. App'x 765, 770 (10th Cir. 2012). The 30-day time limitation for remand because of a defect in the removal procedure applies to actions against federal officers removed under § 1442(a). *Adams v. W. Steel Buildings, Inc.*, 296 F. Supp. 759, 761 (D. Colo. 1969).

### B.    Remand Analysis

Conway objects to the government's removal of this action because he argues HHS cannot show that the Colorado state court order is "against or directed" at HHS or that it would "interfere with the public administration" of the ACA Risk Assessment Program. ECF No. 19 at 8. He also argues that the government's Notice of Removal was untimely filed. *Id.* at 13. The Court addresses each argument in turn.

#### 1.    Directed at HHS

Another Court in this District summarized the requirements for removal under 28 U.S.C. § 1442 as follows: "(1) the proceeding must be a 'civil action,' (2) the civil action must be 'against or directed to' the removing party, (3) the removing party must be one of the entities listed, (4) and the civil action must be 'for or relating to any act under color of such office.'" *In re Baldwin*, No. 21-CV-01233-NRN, 2021 WL 4133916, at *2 (D. Colo. Sept. 10, 2021) (citing *Hammer v. United States Dep't of Health & Hum. Servs.*, 905 F.3d 517, 525–26 (7th Cir. 2018)). The parties do not dispute that the Distribution Motion and subsequent Implementation Order are "civil actions" under the scope of 28 U.S.C. § 1442(d)(1). The parties contest whether the Distribution Motion or the Implementation

Order is "against or directed to" HHS. § 1442(a)(2). Conway argues that the Distribution Motion or Implementation Order is not against or directed at HHS because it does not restrain the government from acting or compel it to act. HHS argues that the Distribution Motion and subsequent Implementation Order "expends itself on the public treasury" by reducing the funds available to pay the government's claim. ECF No. 31 at 7 (citing *Dugan v. Rank*, 372 U.S. 609, 620 ("The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.")).

For support, Conway refers to the Federal Courts' traditional deference to a state's regulation of the "business of insurance." In 1945, Congress passed the McCarran-Ferguson Act, which states, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012. In *U.S. Dept. of Treasury v. Fabe,* the Supreme Court held that an Ohio priority statute was exempt from preemption under the McCarran-Ferguson Act to the extent that it protected policyholders. 508 U.S. 491, 503-504, 509 (1993). Conway argues that Colorado's priority statute governs because it reflects the state exercising its regulatory power over the business of insurance, and that the payments to Denver Health are necessary to protect policyholders. ECF No. 19 at 10. He further argues that HHS can dispute its claim determination in state court under Colorado's statutory process. *Id.* He also points out that HHS is not a party in the state court action. *Id.*

HHS argues that Conway's reliance on *Fabe* and the McCarran-Ferguson Act is premature because it goes to the merits of the case, and the first step is to determine jurisdiction, which requires the Court to determine whether the Distribution Motion or the Implementation Order is against or directed to HHS. For support, HHS cites cases where the court found that a civil action was against or directed to the United States. *See, e.g.*, *In re Rotondo*, No. 16-13324, 2018 WL 3741993, at *6 (E.D. Mich. Aug. 7, 2018); *Jax Leasing, LLC v. Xiulu Ruan*, 359 F. Supp. 3d 1129, 1134 (S.D. Ala. 2019). While the cases cited by HHS do not specifically address insurance liquidation, and in each, the government was named a party in the action, the cases cited by HHS do provide some direction on this issue.

In *In re Rotondo*, the Internal Revenue Service ("IRS") joined a state court action where an Assignor filed for an Assignment for the Benefit of his Creditors (an "ABC" action) and removed the case to federal court without objection. 2018 WL 3741993, at *1. After two years of litigation, the Assignor filed a motion to dismiss, asserting the court lacked subject matter jurisdiction. *Id.* The court denied the motion because § 1442 "allows removal to federal court when a civil action is aimed at a federal agency because of its authority to collect revenue under a federal statute." *Id.* at *4. In *Rotondo*, the IRS was required to file a proof of claim under the state statute. *Id.* The Court found that "the very nature and structure of an ABC action under Michigan law demonstrates that it is *directed* to the assignor's creditors." *Id.* at *5 (emphasis in the original). Like the IRS under Michigan's ABC law, Colorado's priority statute requires HHS to file a proof of claim. The very nature and structure of the Colorado statute at issue here indicate that it is directed

at HHS or at least the funds that HHS has the authority to collect and distribute under a federal statute. The Colorado priority of distribution statute specifically lists as a class one claimant:

> (II) Claims by member insurers for their pro rata share of the *risk adjustment program* payable by an impaired insurer or insolvent insurer if the commissioner determines that the failure of the impaired insurer or insolvent insurer to pay such *risk adjustment program payments* would result in the impairment or insolvency of the claimant member insurer and that such impairment or insolvency would be avoided by payment of the claim. The amount of the payment of the claim must not exceed the lesser of:

> (A) The pro rata amount the claimant member insurer would be entitled to from the *risk adjustment program* but did not receive because the estate of the impaired or insolvent insurer has not made the full payment; or

> (B) The amount needed to avoid the claimant member insurer's impairment or insolvency.

Colo. Rev. Stat. § 10-3-541(1)(a)(II) (emphasis added). The statute specifically refers to the Risk Adjustment Program and the payments HHS is authorized to collect and distribute under the ACA, a federal statute.

In *Jax*, the court denied a motion to remand, finding that the action was directed at the government. 359 F. Supp. 3d at 1133. There, the plaintiff, who held an enforceable lien against the individual defendant, named the government as an additional defendant in a state court action because the defendant had a criminal restitution obligation to the government. *Id.* The plaintiff was seeking to sell the defendant's vehicles and to prevent the government from receiving any of the proceeds until the plaintiff's claim was completely satisfied. *Id.* The federal government removed the action to state court. What *Rotondo* and *Jax*, both out of Circuit cases, stand for is the proposition that when it comes to the distribution of property that the federal government has a claim to, and the

distribution will impact the amount of money the federal government ultimately receives, the action is directed at the federal government.

*Hammer* is also instructive. 905 F.3d at 523. It deals with the liquidation proceedings of a defunct insurance company. In *Hammer*, HHS owed over $70 million to the defunct insurance company. *Id.* at 523. The defunct insurance company owed HHS approximately $32 million in the Risk Adjustment Program. *Id.* HHS, as part of its regulatory oversight, elected to set off its debt payments by first paying down the debt owed by the defunct insurance company to HHS. *Id.* The state court-appointed liquidator filed a motion asking the state court for a declaration that HHS had violated the state court order when it offset the money owed without the court's permission. HHS removed the motion, not the entire liquidation, to the federal district court. *Id.* The district court remanded the case. *Id.* The Seventh Circuit reversed the district court's remand, in part, because it found that "the [liquidator] served HHS with a notice of the [liquidator's] motion, and HHS must respond to the motion [and that] the [liquidator] may eventually ask the court to order HHS to produce the withheld money," requiring HHS to act. *Id.* HHS likewise argues that the Implementation Order required it to act; otherwise, HHS would risk receiving less or no money to make the risk adjustment payments it is required to make under the ACA. HHS clarifies that it does not seek to be paid out of turn. It is asking the Court to set aside the Implementation Order, so that when HHS is paid as a class 3 claimant, it can pay whatever amount of money it receives pro rata to other insurance companies as it is obligated to do under the ACA.

The Court finds that HHS has met the standard for removal. The Distribution Motion and Implementation Order are directed at HHS because they interfere with the amount of funds that may ultimately be available to HHS to distribute through the Risk Adjustment Program under the ACA. The Court recognizes that Conway is not seeking any monetary relief from HHS, nor is he asking the state court to restrain HHS from acting or compelling it to act, but he is seeking to distribute funds that have been designated for HHS. The distribution would not reduce HHS's claim, or the amount HHS is owed, but it would reduce the amount available to class 3 claimants, including HHS, by $6.7 million.[2]

### 2.    Interference with the Public Administration of ACA

Conway argues that the distribution of $6.7 million to Denver Health does not prevent HHS from administering the Risk Adjustment Program because HHS will be able to distribute the funds it receives as a class 3 claimant pro rata to other insurers. He further argues that HHS is not required to make full payments because the Risk Adjustment Program allows for pro rata payments if an insurer becomes insolvent and cannot make payments to HHS. Moreover, HHS has continued to administer the Risk Adjustment Payment without the funds from Friday Health.

HHS argues that if it were to receive the $6.7 million, it would be obligated to distribute the funds according to federal law and the Risk Adjustment Program rules. Nine

---

[2] During oral argument, Conway argued that it was still possible that HHS would receive the entire $19 million that is owed, but that seems unlikely, considering there is probably a limited amount of funds available to pay Friday Health's debts. *See* ECF No. 1-4 at 10 ("The [Special Deputy Receiver] has determined that [Friday Health's] estate will likely be insufficient to fully fund the class 3 claims."). Even if HHS were to receive the entire $19 million, that would not change the analysis because the Distribution Motion and Implementation Order are still "directed" to HHS.

insurers in Colorado, including Denver Health, and five in New Mexico would receive pro rata payments for any charges collected from Friday Health. ECF No. 30 at 22. Denver Health would only receive $1,091,026.08 of the $6.7 million Conway seeks to distribute to Denver Health. *Id.* at 23. HHS argues that the Risk Adjustment Program rules do not allow an insurer to receive more than its pro rata share of the funds and allowing the Implementation Order to stand would contravene federal law.

When the government is forced to collect and distribute funds in a manner that contravenes a federal statute, not only are the actions directed at the federal government, but they also interfere with the administration of the federal program. *See*, e.g., *Baldwin*, 2021 WL 4133916, at *2 (denying plaintiff's motion to remand because the court found that the state court action was "directed" at HHS because "HHS would have to pay funds to a different legal entity than the one agreed to by the parties and approved by a federal court pursuant to a federal statute").

Arguably, HHS has and will continue to be able to implement the Risk Adjustment Program with or without additional money from the Friday Health estate, and HHS can calculate payments owed and distribute pro rata the funds it receives. But that does not mean that Conway's distribution of what Denver Health is owed under the Risk Adjustment Program ahead of other insurers does not interfere with the HHS's public administration of the ACA Risk Adjustment Program. The ACA does not allow one insurer to receive its full amount owed ahead of the other insurers. If Denver Health receives the full $6.7 million it is owed ahead of the other insurers who are owed funds under the Risk Adjustment Program, that will likely result in less for the other insurers. Forcing HHS to

distribute less than it might have otherwise interferes with its implementation of the Risk Management Program. Therefore, the Court finds HHS has met its burden to show interference with its operations.

### 3.    Timeliness

The Commissioner argues that the Notice of Removal was untimely filed. In general, the notice of removal must be filed within 30 days after the party seeking removal receives the removable pleading. *See* 28 U.S.C. 1446(b)(1). If the initial pleading is not removable, then the notice of removal must be filed within 30 days after the party receives "a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). In other words, "[t]he 30-day clock does not begin to run until the plaintiff provides the defendant with 'clear and unequivocal notice' that the suit is removable.*"* *Paros Props. LLC v. Colo. Cas. Ins. Co.*, 835 F.3d 1264, 1269 (10th Cir. 2016) (quoting *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1036 (10th Cir. 1998)).

The parties dispute when the case first became removable as to trigger the 30-day clock under 28 U.S.C. § 1446(b)(3). HHS filed its Notice of Removal on December 16, 2024. ECF No. 1. According to HHS, its notice is timely because it first learned that the case was removable when Conway served the government with its Motion for Distribution on November 14, 2024. That is the first time "the United States was aware of the Liquidator's attempt to use the Risk Adjustment Super Priority Claim Program." ECF No. 31 at 17. According to Conway, the notice is untimely because the Colorado state law, which HHS believes is preempted by the Federal Priority Statute, was implemented on

March 15, 2023. *See* Colo. Rev. Stat. § 10-3-541(1)(a)(II). Conway provided HHS notice of Friday Health's liquidation on September 25, 2023. HHS filed its proof of claim on June 18, 2024. According to Conway, HHS knew as of June 18, 2024, that resolution of its claim would be based on issues of federal preemption, prompting its obligation to remove. ECF No. 19 at 14.

The Tenth Circuit is "very strict in assessing whether the grounds for removal are ascertainable." *Paros Props.*, 835 F.3d at 1269. To trigger the start of the thirty-day removal clock, the complaint must provide the defendant with "unequivocal notice of the right to remove." *Id.* (quoting *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1036 (10th Cir. 1998)). Here, the Court finds that the Defendant was not provided with "unequivocal notice of the right to remove" until Conway served HHS the Motion for Distribution. Until then, HHS could not have been certain that Conway would apply the new Colorado law governing priority payments to insurers, like Denver Health, for their pro rata share of the Risk Adjustment Program payable by an impaired insurer or insolvent insurer. *Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 162 (4th Cir. 1997) ("[W]e will not require courts to inquire into the subjective knowledge of the defendant, an inquiry that could degenerate into a mini-trial regarding who knew what and when . . . . [The grounds for removal must] be apparent within the four corners of the initial pleading or subsequent paper."). Thus, the 30-day clock was not triggered until November 14, 2024, when HHS received notice of the Distribution Motion. HHS's Notice of Removal is timely.

### C.    The Court has Jurisdiction to Decide Federal Preemption Issues

One of the questions presented to the parties in advance of oral argument asked—"Whether, where, or how could Health and Human Services ("HHS") challenge Colorado's priority statute if not through removal of this matter to federal court?" ECF No. 41. HHS argued that it had no mechanism to challenge Colorado's statute until the Implementation Order was issued. Conway argues two ways in which HHS could have challenged the Colorado statute in state court: 1) Colo. Rev. Stat. § 10-3-538 allows claimants to file objections with the liquidator when a claim is denied in whole or in part by the liquidator; or 2) HHS could have moved to intervene in the state court action under Colorado Rule of Civil Procedure 24. The problem with the first option is that HHS would have to wait until its claim is denied to file an objection, and by that time, the $6.7 million will have been distributed to Denver Health. During oral argument, Conway conceded that federal court is an appropriate venue to hear federal preemption issues, but he argued that state courts are also capable of deciding federal preemption issues and that HHS failed to avail itself of the remedies available in state court. Conway argues that federal court jurisdiction is only appropriate if HHS can demonstrate that the Implementation Order was "directed at" HHS. The Court has already ruled it was directed at HHS because, as Conway conceded during oral argument, it may reduce the amount HHS ultimately receives on its claim and interferes with HHS's public administration of the ACA's Risk Adjustment Program.

Another important wrinkle discussed during the motions hearing is that the Implementation Order does not just impact the distribution of the Risk Adjustment Program payments among Colorado insurers. It also involves distribution payments to

New Mexico insurers. During oral argument, Conway suggested that New Mexico insurers could intervene in the state court liquidation action under Colorado Rule of Civil Procedure 24. Arguably, if New Mexico were to intervene, that would then pit one state against another, which could once again allow the matter to be removed to federal court.

Another strong argument that the federal court is the appropriate venue for this matter is that, as both parties concede, this is a matter of first impression. No other state, to the parties' knowledge, has passed a similar priority statute regarding the distribution of the Risk Adjustment Payment under the ACA. Other states are likely monitoring the outcome of this case, and if the Court were to find there was no preemption in this case, other states like New Mexico may pass similar laws, which could have a large impact on how the ACA's Risk Adjustment Program is implemented across the nation. As the Seventh Circuit recognized in *Hammer*, "inconsistent decisions of so many different state fora could have dire consequences for the complex regulatory framework of the Affordable Care Act, if not the insurance market as a whole. The federal government's interest in the relative uniformity of the federal courts is substantial." 905 F.3d at 533.

The Supreme Court has instructed that the federal officer removal statute is to be "liberally construed." *Watson*, 551 U.S. at 150. The Court finds HHS has met its burden in establishing jurisdiction by a preponderance of the evidence. *Dutcher*, 733 F.3d at 985. The Court finds the Motion for Distribution and the subsequent Implementation Order are directed at HHS because they will likely reduce the amount HHS will receive as a class 3 claimant and interfere with HHS's administration of the Risk Adjustment Program. The Court finds it has removal jurisdiction of this matter. Having decided that this Court has

jurisdiction and a federal court is likely the best forum to decide this federal preemption issue, the Court will now turn to HHS's Motion to Set Aside and the issue of preemption.

## III.    MOTION TO SET ASIDE

The state court has already issued an order in this matter permitting Conway to distribute funds under the new provision in Colorado's priority statute. HHS argues the Implementation Order should be set aside because the new provision relied on by the state court in issuing its order is preempted by federal law. HHS must provide a reason why this Court should set aside the order issued by the state Court.

### A.    Relief from Order

Federal Rule of Civil Procedure 60(b)(1) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect . . . ." Fed. R. Civ. P. 60(b)(1). "A motion to vacate [an order] under Rule 60(b) is left almost entirely up to the discretion of the trial court. *Greenwood Expls., Ltd. v. Merit Gas & Oil Corp.*, 837 F.2d 423, 426 (10th Cir. 1988). The moving party has the burden to plead and prove excusable neglect. *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990).

HHS asks the Court to set aside the Implementation Order based on its excusable neglect under Federal Rule of Civil Procedure 60(b)(1). HHS argues that its failure to object to the Distribution Motion was excusable neglect. Relevant factors in determining whether neglect is excusable include: "the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the

delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Jennings v. Rivers*, 394 F.3d 850, 857 (10th Cir. 2005) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). "An additional consideration is whether the moving party's underlying claim is meritorious." *Id.* (citation omitted).

The Court finds that there are grounds for excusable neglect. First, both parties agree that there is no prejudice to the Liquidator if the Court sets aside the Motion. Instead, Conway argues there will be "significant prejudice" to Denver Health, the subject of the Implementation Motion, if there is a delay or non-payment of the state court-approved Implementation Motion. Denver Health will suffer financially if it does not receive the $6.7 million distribution. The standard is whether the opposing party will be prejudiced. Here, the Liquidator is the opposing party, and the parties agree he will not be prejudiced. If the Court sets aside the Implementation Motion, the $6.7 million does not disappear; it remains in Friday Health's estate. As Conway has argued, the Implementation Order does not change the calculation of how much Denver Health is owed in risk adjustment payments. If HHS receives the $19 million it is owed as a class 3 claimant, which Conway argues is possible, Denver Health will eventually receive the $6.7 million it is calculated to receive under the Risk Adjustment Program.

Next, the Court looks at the delay caused by HHS's actions. Conway argues that to prevent delay, HHS should have objected to the Distribution Motion within 21 days as allowed by the Colorado Rules of Civil Procedure. *See* C.R.C.P 121 § 1-15(1)(b) ("The responding party shall have 21 days after the filing of the motion or such lesser or greater

time as the court may allow in which to file a responsive brief.") But as discussed above, the proper procedure for HHS to challenge the Distribution Motion and/or the new provision of the Colorado priority statute was unclear. *See supra* Section II.B.3-C. HHS sought to challenge both by removing this matter to federal court. The Court has already ruled that HHS's removal was timely. This is not a situation where there has been "a pattern of deliberate dilatoriness and delay." *Jennings*, 394 F.3d at 856. (citation omitted). Conway makes similar arguments regarding HHS's good faith. He argues that HHS was served the Distribution Motion on November 14, 2024, but did not contact him until after the Implementation Order was issued. The Court does not find that HHS was careless in its actions. *See Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990) (affirming default judgment after district court found that "attorney carelessness" in failing to respond to a motion to dismiss "could not amount to excusable conduct under Rule 60(b)"). HHS took the steps it believed were appropriate to protect its interests in a timely fashion. Nothing indicates that HHS did not act in good faith. Finally, this is an important issue of first impression. Rather than deny relief based on technicalities, the Court should decide the case on the merits. *See Greenwood Expls., Ltd.*, 837 F.2d at 426 ("[G]ranting relief under Rule 60(b) is an extraordinary procedure[; however, o]n the other hand, a Rule 60(b) motion should be liberally construed and every effort should be made to try cases on their merits.") (quotations and citations omitted). Having found grounds for excusable neglect, the Court will now move on to the merits of the matter—preemption.

**B.**    **Preemption Analysis**

HHS argues that this court should set aside the Implementation Order because
Colo. Rev. Stat. § 541(1)(a)(II) is preempted by two federal laws: 1) the Federal Priority
Statute and 2) the ACA.

**1.**    **Legal Standard for Preemption**

The Supreme Clause enables federal law to preempt state law due to its
command that federal law is "the supreme law of the land." U.S. Const., Art. VI, cl. 2. It is
a familiar and well-established principle that the Supremacy Clause . . . invalidates state
laws that "interfere with, or are contrary to," federal law. *Hillsborough County, Fla. v.
Automated Medical Labs.*, 471 U.S. 707, 712 (1985) (citing *Gibbons v. Ogden*, 22 U.S.
(1824)). There are two cornerstones of preemption jurisprudence. *Wyeth v. Levine*, 555
U.S. 555, 565 (2009). "First, 'the purpose of Congress is the ultimate touchstone in every
pre-emption case.'" *Id.* (*quoting Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).
"Second, [i]n all pre-emption cases, and particularly in those in which Congress has
legislated . . . in a field which the States have traditionally occupied," we begin "with the
assumption that the historic police powers of the States were not to be superseded by the
Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting
*Medtronic, Inc.*, 518 U.S. at 485) (internal quotation marks omitted).

Federal preemption must be supported by the text of the United States
Constitution, a federal statute, or even a regulation promulgated under a federal statute.
*Sup. Ct. of N.M.*, 839 F.3d. at 918–19. "There is no federal pre-emption *in vacuo*[.]" *P.R.
Dep't of Consumer Affs. v. Isla Petrol. Corp.*, 485 U.S. 495, 503 (1988). Conflict

preemption, the type at issue here, occurs (1) when compliance with federal and state law is impossible or (2) because the state provisions are an "obstacle to the accomplishment and execution of the full purposes and objectives of" the federal law. *Sup. Ct. of N.M.*, 839 F.3d. at 918 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

### 2. Preemption Analysis

"[F]or federal law to control in state insurer insolvency proceedings, the government must overcome the presumption against preemption. To do so, it must identify a clear and manifest intent to preempt Colorado law that fixes creditors' rights during insolvency." *Conway v. United States*, 997 F.3d 1198, 1208 (Fed. Cir. 2021) (hereinafter "*Conway I*"). First, the Court must determine whether the McCarran-Ferguson Act applies to the Court's preemption analysis because it sets forth Congress's intent for federal law not to preempt state insurance insolvency laws. The McCarran-Ferguson Act, 15 U.S.C. § 1012 states, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." Thus, this Court must determine whether the ACA or the Federal Priority Statute "specifically relates to the business of insurance" and/or whether the Colorado priority statute is a law enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012.

Both parties agree that the ACA relates to the business of insurance, and therefore, when it comes to the Court's preemption analysis regarding the ACA, the

McCarran-Ferguson Act will not be applied. *See, e.g.*, *UnitedHealthcare of New York, Inc. v. Lacewell*, 967 F.3d 82, 92 n.4 (2d Cir. 2020) ("Because the ACA 'specifically relates to the business of insurance,' the McCarran–Ferguson Act's special anti-pre-emption rule, which would otherwise require a specific statement of intent to preempt state insurance laws, does not apply.") (citation omitted); *Conway I*, 997 F.3d 1198 at 1208 n.4 ("Because we hold federal law does not preempt under the ordinary preemption framework, we need not address [Conway's argument that that our preemption analysis is narrowed by the McCarran-Ferguson Act's nonpreemption provision]. We do note, however, that Conway concedes the ACA relates to insurance.").

On the other hand, the Court finds that the McCarran-Ferguson Act does apply to its analysis of whether the Federal Priority Statute preempts Colorado's statute. *See, e.g.*, *Fabe*, 508 U.S. at 493 (applying the McCarran-Ferguson Act in its analysis as to whether the Federal Priority Statute preempted an inconsistent Ohio law). During oral argument HHS said it did not concede that Colorado's priority statute's purpose is regulating the business of insurance; however, in doing so, HHS referred to the Supreme Court's ruling in *Fabe*, which held that an Ohio priority statute was "enacted for the purpose of regulating the business of insurance" and therefore was exempt from preemption by the Federal Priority Statute under the McCarran-Ferguson Act. 508 U.S. at 508. HHS does not appear to contest the Court's application of the McCarran-Ferguson Act in its preemption analysis regarding the Federal Priority Statute, but rather, argues that Colorado's statute was not enacted for the purpose of regulating the business of insurance, which is the heart of the

issue. The Court will begin its analysis with the Federal Priority Statute and then proceed to the ACA.

### a)    Federal Priority Statute

The Federal Priority Statute, 31 U.S.C. § 3713, accords first priority to the United States with respect to a bankrupt debtor's obligations. An exception to giving first priority to claims of the federal government was carved out by the McCarran-Ferguson Act and the Supreme Court's subsequent decision in *Fabe*. The McCarran-Ferguson Act was passed to preserve the individual states' power to regulate the insurance industry. *Fabe*, 508 U.S. at 499. In *Fabe*, an Ohio statute gave claims of the federal government fifth priority in proceedings to liquidate an insolvent insurance company behind 1) administrative expenses, 2) specified wage claims, 3) policyholders' claims, and 4) claims of general creditors. *Id.* at 495. The Supreme Court held that Ohio could prioritize administrative expenses and policyholder claims ahead of the federal government's claims because those portions of the Ohio statute were enacted for the purposes of regulating the business of insurance. *Id.* at 508-09. The portion of the Ohio statute that prioritized the specified wage claims and claims of general creditors ahead of the federal government could "not escape pre-emption because their connection to the ultimate aim of insurance is too tenuous." *Id.* at 509.

Before 2023, Colorado's priority statute was consistent with the Supreme Court's holding in *Fabe*. Class 1 claimants included "[t]he costs and expenses of administration during rehabilitation and liquidation," Colo. Rev. Stat. § 10-3-541(1)(a)(I)(A)-(F), class 2 claimants included "[a]ll claims under policies" *id.* § 10-3-541(1)(b), and class 3 claimants

included "[c]laims of the federal government" *id.* § 10-3-541(1)(b). *See also* Laws 2023, Ch. 195 (H.B. 23-1303), § 1, eff. May 15, 2023. In 2023, the statute was changed to add a new class 1 claimant:

> Claims by member insurers for their pro rata share of the risk adjustment program payable by an impaired insurer or insolvent insurer if the commissioner determines that the failure of the impaired insurer or insolvent insurer to pay such risk adjustment program payments would result in the impairment or insolvency of the claimant member insurer and that such impairment or insolvency would be avoided by payment of the claim.

Colo. Rev. Stat. § 10-3-541(1)(a)(II). Like the Supreme Court in *Fabe*, "[t]o resolve this case, [the Court] must decide whether a state statute establishing the priority of creditors' claims in a proceeding to liquidate an insolvent insurance company is a law enacted 'for the purpose of regulating the business of insurance,' within the meaning of § 2(b) of the McCarran–Ferguson Act, 15 U.S.C. § 1012(b)." 508 U.S. at 494.

During oral argument, Conway made the point that if the Court were to find the Federal Priority Statute preempts the Colorado priority statute, that would create a slippery slope because it would give the federal government clearance to challenge other class 1 and class 2 claimants that had priority over the federal government in a state's insurance liquidation proceedings. The Court does not agree. The Supreme Court's ruling in *Fabe* has already addressed and blessed the Colorado Priority statute's class 1 (administrative costs) and class 2 (policyholder claims) claimants that existed before 2023. It is Colorado's novel creation of a new class 1 claimant in 2023 that HHS is challenging. That is why, in determining whether Colorado's priority statute's purpose is for the regulation of insurance, the Court must conduct a line-by-line (or provision-by-

provision) analysis of the statute and not focus on the general intent and purpose of the statute as a whole.

HHS argues that Colo. Rev. Stat. § 10-3-541(1)(a)(II) does not escape preemption under the McCarran-Fergueson Act because the disbursement of the estate's funds to another Colorado insurer is neither a cost or expense of administering Friday Health's liquidation, nor a payment of Friday Health's policyholder claims. ECF No. 30 at 20. HHS argues that a state statute can only relate to the business of insurance under *Fabe* if it benefits the insolvent insurance company's policyholders. Conway argues for a broader interpretation of *Fabe*, arguing that the "driving force" behind Colo. Rev. Stat. § 10-3-541(1)(a)(II) was to protect policyholders by ensuring "better stability in the Colorado insurance marketplace." ECF No. 34 at 14. Conway argues that even if the disbursement to Denver Health is not a payment directly to Friday Health's policyholders, it still benefits Friday Health policyholders, some of whom moved to Denver Health, because it helps prevent the impairment of Denver Health.

This argument has some intrinsic appeal; however, Conway does not cite any cases where a court found reverse preemption for a state statute under McCarran-Ferguson where the payment benefited policyholders of an insurer other than the insolvent insurer. This is perhaps not surprising given the novel issue presented here. The most analogous case cited by Conway is *Ruthardt v. United States*, 303 F.3d 375, 382 (1st Cir. 2002). In *Ruthardt*, the First Circuit affirmed a district court's ruling that a Massachusetts state law that gave subrogated claims made by guaranty funds, not the policyholders themselves, priority ahead of the federal government's claims, reverse

preempted the Federal Priority Statute. *Id.* at 386. There, the court had to decide whether the Massachusetts law was close enough to the enforcement of the original insurer-insured contract to qualify for McCarran-Ferguson protection. The First Circuit recognized that the Supreme Court "read the exemption" of the "state's regulation of insurance business" "more narrowly than literally, making [it] an extremely close case." *Id.* at 381. The court ultimately found that because the policyholders could have filed the claims themselves with priority over the federal government, payment to the guaranty funds ahead of the federal government benefited the defunct insurance company's policyholders by indirectly facilitating prompt payments promised to them as recognized by *Fabe*. *Id.* at 382.

There is no doubt that Colorado passed Colo. Rev. Stat. § 10-3-541(1)(a)(II) intending it to be part of the state's regulation of insurance of business and to protect Colorado policyholders no matter their insurer. As in *Ruthardt*, this is an extremely close case. However, the Court is not convinced that under *Fabe* and its narrow interpretation of the "business of insurance," the Colorado statute giving priority to other insurers' claims for their Risk Adjustment Program payments is a law enacted for the purpose of regulating the business of insurance recognized by *Fabe*. 508 U.S. at 508. The connection between the benefits to non-Friday Health policyholders and the insurer-insured contract between Friday Health and its policyholders is too tenuous to fall within the ambit of the McCarran-Ferguson Act. *See id.* ("Of course, every preference accorded to the creditors of an insolvent insurer ultimately may redound to the benefit of policyholders by enhancing the reliability of the insurance company. This argument, however, goes too far: But in that

28

sense, every business decision made by an insurance company has some impact on its reliability . . . and its status as a reliable insurer.") (quotation and citation omitted); *see also Ruthardt,* 303 F.3d at 382 ("Merely reducing insurer costs (through low cost purchasing or peer review schemes) may benefit policyholders in the long run, but the connection may be too remote.") (quotation and citation omitted). Additionally, under Colorado's priority statute Denver Health is a class 1 claimant receiving priority over Friday Health's policyholders' claims as class 2 claimants, some of whom are not even Colorado claimants. Conway does not explain how those claimants benefit by Colorado's prioritization of a Colorado policyholder. Therefore, the Court finds that Colo. Rev. Stat. § 10-3-541(1)(a)(II), as written, is preempted by the Federal Priority Statute.

### b)      ACA

Now the Court turns its preemptive intent analysis to the ACA and whether the ACA preempts Colo. Rev. Stat. § 10-3-541(1)(a)(II). The Court first looks to the statutory text. The ACA contains an express preemption clause: "Nothing in this title shall be construed to preempt any State law that does not prevent the application of the provisions." 42 U.S.C. § 18041(d). "This preemption clause is a narrow one, and only those state laws that hinder or impede the implementation of the ACA run afoul of the Supremacy Clause." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015) (quotation and citation omitted); *see also Conway I*, 997 F.3d at 1209 (Fed. Cir. 2021) ("If anything, § 18041(d) expresses congressional intent to preempt only a narrow class of state laws." (citation omitted)).

The Court must consider whether Colo. Rev. Stat. § 10-3-541(1)(a)(II) "prevents or impedes the application" of the ACA's provisions of its implementing regulations. *See* 42 U.S.C. § 18041(d). As mentioned before, the ACA prescribes only two ways to run a Risk Adjustment Program. Either HHS runs the program, or a state government can elect to run its own program after getting HHS's approval. 42 U.S.C. §§ 18041(b)–(c). The Supreme Court has held that if a federal statute allows a state to assume responsibility for a program with approval, approval is necessary; otherwise, the state law is impliedly preempted. *See* Gade v. *Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) (holding state regulation of occupational safety and health issues which has not been approved by the Secretary of Labor, and for which federal standard is in effect, is impliedly preempted as in conflict with full purposes and objectives of the Occupational Safety and Health Act).

It is undisputed that Colorado has not and does not seek to implement its own Risk Adjustment Program. ECF No. 34 at 19. Conway argues that Colorado's priority statute is "separate and apart from the ACA and does not interfere with HHS applying the ACA's provisions as part of the risk adjustment program." *Id.* During oral argument, Conway argued that the ACA does not regulate in the areas of insurance liquidation proceedings, therefore, Colorado's priority statute cannot be preempted because there is nothing in the Colorado statute that prevents the application of the ACA. Conway is simply making payments from a liquidated insurer's estate to another state insurer. He is not taking the Risk Adjustment Program funds and redistributing them as he sees fit. HHS disagrees, arguing that the new provision in Colorado's priority statute "alter[s] the federal

government's determination of how much the insurers should be paid under the risk adjustment program [and] 'frustrates the ACA's federal regulatory scheme'" by "effectively recalculate[ing] the amounts the insurers are owed under the program and mak[ing] payments that only HHS is legally authorized to make." ECF No. 30 at 20.

The parties primarily rely on two cases to support their positions. HHS relies on *UnitedHealthcare*, 967 F.3d at 82. In *UnitedHealthcare*, the Second Circuit held that a New York state emergency regulation conflicted with the ACA and its implementing regulations, and, thus, was preempted. There, healthcare insurers who received risk adjustment payments under the ACA's Federal Risk Adjustment Program brought action against New York state officials, alleging that the ACA preempted that state emergency regulation which would reduce payments calculated according to federal methodology, and that regulation would effect unconstitutional takings or illegal exactions of payments received under federal program in violation of the Fifth and Fourteenth Amendments. The state emergency action required state insurers to remit up to 30% of the risk adjustment payment they received from HHS into a State market stabilization pool.

Conway relies on *Conway I*, 997 F.3d 1198. In *Conway I*, the Federal Circuit held that the ACA did not preempt Colorado law. Conway brought the case in federal court against HHS. There, unlike here, Conway sought jurisdiction in federal court to decide a federal preemption issue and did so by directing the lawsuit at HHS. In *Conway I*, HHS owed an insolvent insurer $42 million. The insolvent insurer owed HHS $24 million. Rather than pay its debt in full, HHS attempted to offset its debt with the money the insolvent insurer owed. Conway argued that Colorado law required that HHS pay its debt

in full and then submit a claim for the money it was owed, as a class 3 claimant under Colorado law. Before oral argument, the court asked the parties how the holdings of the two cases can be reconciled.

HHS argues the cases are distinguishable because, in *UnitedHealthcare*, like the situation here, the state statute affects the methodology used to calculate the risk adjustment program. Whereas in *Conway I*, the issue was "payment convenience" for HHS. 997 F.3d at 1213. Conway argues that *UnitedHealthcare* is inapplicable for a couple of reasons: 1) New York was collecting ACA Risk Adjustment Program payments and redistributing them whereas Conway is seeking to distribute funds from Friday Health's estate, not the risk adjustment payments themselves, and 2) the issue in *UnitedHealthcare* was an emergency regulation, whereas here the issue is a codified state statute that Conway championed as being in the interest of the state insurance market and regulating the state insurance market. *See* ECF No. 34 at 14 (citing testimony of Conway supporting the bill in front of the Colorado General Assembly's Health and Human Services Committee). Conway argues that *Conway I* is directly on point because it analyzed whether the ACA preempted state laws in the context of insurance liquidation proceedings, and *UnitedHealthcare* did not.

The Court appreciates Conway's argument that, because the ACA is silent regarding and does not regulate insurance liquidation proceedings, the ACA cannot preempt a state statute regulating insurance insolvency proceedings. *See Conway I*, 997 F.3d at 1208 (Fed. Cir. 2021) ("The text of the statutory scheme is silent regarding creditor priority during insurer insolvency. No section of the ACA, which spans thousands of

pages, relates to insurer liquidation."). Conway argues that if Congress intended the federal government's involvement in insurance liquidation, it could have expressly chosen to do so in the ACA. Instead, Congress left insurance liquidations up to the states. However, there is a relevant distinction between the issue in *Conway I* and the issue before this Court. The Colorado statute at issue in *Conway I*, did not impede HHS's implementation of the Risk Adjustment Program because it did not impact/reduce the amount of risk adjustment payment an insurer was to receive from HHS. In *Conway I*, HHS was attempting to leapfrog other creditors, including the insolvent insurer's policyholders, with an offset. The opposite is occurring here; Conway is attempting to leapfrog other creditors, including Friday Health's policyholders, by prioritizing Denver Health over class 2 policyholder claims and other insurers who would receive money from HHS if HHS received the money as a class 3 claimant. Conway argues he is not telling HHS how to distribute the money it ultimately receives, but he does concede that the distribution of the $6.7 million to Denver Health is likely to impact/reduce the amount of risk adjustment payment insurers will receive, including insurers in New Mexico.

UnitedHealthcare is more analogous to the facts here. *UnitedHealthcare* does not address insolvency law, but it does deal with the ACA's Risk Adjustment Program and how payments under the program are calculated. In *UnitedHealthcare*, the state regulation reduced the amount of risk adjustment payments an insurer received under the program. The same is true here. Colorado's priority statute will likely reduce the amount of risk adjustment payments insurers, other than Denver Health, will receive. If HHS received all the money Friday Health owed in risk adjustment payments, over $19 million,

then HHS would distribute the funds pro rata under the ACA and its implementation regulations, and Denver Health would receive $6.7 million. However, if HHS only received $6.7 million of the $19 million risk adjustment payments Friday Health owed, and HHS distributes the funds pro rata under the ACA and its implementation regulations, Denver Health would only be entitled to over $1 million. HHS is required to distribute the funds pro rata. The ACA does not allow HHS to expedite or shift funds to insurers in need to try and prevent insolvency.

Conway argues that, unlike New York in *UnitedHealthcare*, he is not collecting ACA Risk Adjustment Program payments and redistributing them as he sees fit. Even though he is not collecting the Risk Adjustment Program payments directly, he is attempting to distribute money from Friday Health's estate that has been designated for Risk Adjustment Program payments, which the Court finds similar to what New York was attempting to do. The ACA does not allow any state to distribute Risk Adjustment Program payments owed unless the state has received prior approval from the federal government. There is no evidence that Colorado sought approval from the federal government to distribute Risk Adjustment Program payments. Conway also tries to distinguish between Colorado's statute and New York's emergency regulation, which is a distinction without a difference. Both were passed to stabilize the insurance markets, which is also the same goal as the ACA's risk adjustment program. Arguably, state insurance commissioners of each state have the most experience with their state's insurance market to know which insurer would benefit most from funds in their state, but neither Colorado nor New York chose to implement their own Risk Adjustment Program. Unlike New York's regulation,

Colorado's statute will impact the risk adjustment payments to insurers in another state, potentially contributing to a domino effect of insolvent insurers in multiple states. Similar to the emergency regulation in *UnitedHealthcare*, Colorado's new provision modifies the federal methodology used to calculate risk adjustment payments, conflicting with the ACA. 967 F.3d at 92. No matter the good intent of the states, unfortunately preemption may apply if their statute impedes the application of the ACA.

The Court finds that, like other circuits that have held the ACA preempts state law, Colo. Rev. Stat. § 10-3-541(1)(a)(II), involves a "clear contextual conflict" and "involve[s] substantive issues underpinning the ACA's objectives." *Conway I*, 997 F.3d at 1214 (distinguishing between *Conway I* and *UnitedHealthcare* because the statute at issue in *UnitedHealthcare* "underpin[ed] the ACA's objectives, like the methodology used to calculate risk adjustment payments"); *see also St. Louis Effort for AIDS*, 782 F.3d at 1016 (finding that several of the Missouri state laws challenged in the case were likely preempted since the laws interfered with federal law by preventing certain federal officials from performing their required duties); *Coons v. Lew*, 762 F.3d 891 (9th Cir. 2014) (finding the ACA preempts an Arizona state law under the doctrine of conflict preemption since the state law stands as an obstacle to or frustrates the purpose of the ACA by providing that Arizona citizens may forgo minimum health insurance coverage and abstain from paying any penalties, thereby obstructing Congress' objective to expand minimum essential health coverage nationwide through the ACA's individual mandate). Congress has spoken on how the risk adjustment payments are to be distributed, and Colorado's new addition to its priority statute prevents the distribution from being paid out as intended

by the ACA. Conway's argument that Colorado's new law is separate from the ACA does not carry the day. The new provision in the statute specifically refers to the payments from the ACA's Risk Adjustment Program. Said another way, but for the ACA's Risk Adjustment Program, there would not be any money to distribute under Colo. Rev. Stat. § 10-3-541(1)(a)(II). Therefore, because the new provision in Colorado's priority statute impedes the HHS's application of the ACA, and Colorado has not sought approval to manage its own risk adjustment program, the Court finds that the ACA preempts Colo. Rev. Stat. § 10-3-541(1)(a)(II).

## IV.    CONCLUSION

For the foregoing reasons, the Court finds removal was timely and that the state court action was directed at HHS. Thus, the Court will **DENY** the Motion to Remand. HHS has demonstrated excusable neglect to set aside the Implementation Order. More importantly, the Court finds that Colo. Rev. Stat. § 10-3-541(1)(a)(II) is preempted by the Federal Priority Statute and the ACA. Therefore, the Court will **GRANT** HHS's Motion to Set Aside the Implementation Order.

Accordingly, it is **ORDERED** as follows:

1) The Motion by the Colorado Commissioner of Insurance to Remand the Notice of Removal Filed by the United States, ECF No. 19, is **DENIED**; and

2) The United States' Motion to Set Aside State Court Order Granting Petitioner's Motion to Disburse Class 1 Funds, ECF No. 30, is **GRANTED**.

DATED:  June 27, 2025

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge